Robert McFarland, Special Judge,
delivered the opinion of the Court.
This bill was filed in the Chancery Court at Ma-ryville, in May, 1865, alleging, in substance, that, on the 25th of November, 1862, he sold to the defendant a tract of land in Blount County, for sixteen hundred dollars; and that a title bond was executed, a copy of which is exhibited with the bill. The title bond provides that the price of $1,600 was to be divided into two payments — $1,300 due the 25th November, 1862, and $300 due the 25th November, 1863, for which amount, notes under seal, were executed. The bill alleges that, in fact, only the latter note was executed ; that the first payment was arranged in the following manner: Complainant was anxious to realize money out of the sale of his land, to enable him to leave the county. The defendant was in possession of two slaves, a woman, Celia, and her child,- Harriet, which the defendant and others, represented as belonging to his wife. One George Griffith wanted to buy said slaves, but would not do so unless the conveyance was regularly executed by defendant and his wife, which being done, he was willing to give $1,300 for the slaves. With this understanding, complainant agreed to take the -slaves in satisfaction of the $1,300, provided defendant’s wife would join in the bill of sale, *210 and submit to a privy examination touching its execution.
That, accordingly, the defendant wrote a bill of sale, signed his own and his wife’s name; that, under the bill of sale the slaves were sent to him, and remained in his possession; but that it was expressly stipulated between him and the defendant, that the conveyance, in its present form, was not to be accepted until acknowledged by the wife, in the manner before stated.
That the matter stood thus, until the fall of 1863, when he was captured and taken South by the rebel troops. He, in the meantime, was laboring to have the matter adjusted. He was retained in prison about a year, and in the meantime, the value of the slaves was destroyed by the result of the war, and finally, the institution abolished. He prays either for a rescission of the contract, or for a decree for the entire amount of purchase money and interest, including both payments — the $300 note being unpaid.
The answer admits the purchase of the land, the execution of the title bond, the execution of the $300 note; but says the “balance of said purchase money of $1,300 was fully paid and discharged by the sale and delivery to complainant by the defendant and his wife, of the negro woman, Celia, and her child, Harriet.” That the defendant and his wife sold to complainant the said negro woman and her child, in payment and satisfaction of the said sum of $1,300, and the same were so received by the complainant as a full and complete satisfaction.”
*211 That he did sign his wife’s name to the bill of sale, but that it was done at her request, and in the presence of the complainant. That complainant received and retained possession of the slaves, and made no complaint until he found that the slaves were about to be lost. Says that his wife was always ready to acknowledge the execution of the bill of sale, and submit to a privy examination, but she was prevented from doing so by reason of the occupation of the country by rebel troops, of whom they stood in fear.
The answer also insists that complainant bought the two negroes to keep, and suffered no loss by reason of the bill of sale not being acknowledged.
The proof is, in substance, about this: It was generally understood by all parties, that the title to the slaves was in the defendant’s wife. It was so understood by both the complainant and defendant, and that it was neccessary for her to join in the bill of sale. The witnesses speak of the sale of the land, and the bill of sale of the slaves having both been made about the same time; but in fact the title bond was executed the 25th of November, 1862, and the bill of sale executed the 13th of March, 1863. No witness speaks to the direct point, as to whether or not, at the time of the bill of sale and slaves were delivered, there was a stipulation that the sale and acceptance of the slaves in satisfaction of the $1,300, was dependent upon the condition that the bill of sale was acknowledged by the wife in the manner prescribed.
There is complete evidence that both parties seemed to regard this as necessary, and the defendant and wife *212 were several times applied to, to go to Maryville and have the privy examination made, and generally expressed a willingness to do so, but said they were afraid of the rebel troops, but that they would do so at any convenient time. The evidence of George Griffitt, to whom complainant said he had negotiated a sale upon condition Mrs. Harbison would join in the conveyance, shows, that before the sale to the complainant, he bargained for the slaves for his son-in-law, but because afraid of the title, the trade was not consummated; but he says he had no connection with complainant’s trade. There is some evidence that at least one purchaser was deterred from buying from complainant, on account of the supposed defect in the title. On the other hand, there is some evidence that complainant was satisfied to keep the slaves for his own use, and spoke of going to Kentucky with them.
There is no evidence as to the origin of the title to the slaves, or as to where the title really was.
There is some other evidence not material now to be noticed.
The case as now presented by this record, is by no means free from difficulty. For the defendant it is argued and authorities cited, to prove, the complainant being in possession of the slaves under a bill of sale good against the husband, containing warranty of title, that he has no right to have the sale of the slaves to bim rescinded. But the ground upon which the bill places this case is, that, in fact, the bill of sale was never accepted; that he contracted for the title of Mrs. Harbison; that the defendant was to procure this title; *213 and that, until this was done, the sale of the slaves to him was incomplete, and his debt against the defendant for the first payment of $1,300 upon his land, not extinguished. The Chancellor held, that the sale of the slaves was not complete, and rendered a decree for the whole amount of the purchase money and interest, and ordered a sale of the lands in satisfaction thereof, allowing no abatement for the hire of the slaves during the time they were in complainant’s possession, although the record does not show that he offered to return them.
We are of opinion that a proper determination of this case depends very materially upon the question, whether or not, at the date of said transaction, Mrs. Harbison had a separate estate in these slaves so as to make it necessary for her to join in the conveyance. How this fact really was, this record does not satisfactorily establish. That the parties all so understood it, there is no doubt; but whether this was so in point of fact, or only their mistaken opinion of the law relative to the conveyance of slaves acquired by warranty, does not clearly appear. It is, perhaps, true, that the legal effect of the record upon this question is either one way or the other — that, in legal contemplation, the fact is either established or it is not established; but there is no evidence of the origin of the title to these slaves. If such separate estate existed in Mrs. Harbison, we may safely assume that there is some means of establishing the fact by legal testimony. That more satisfactory proof may be had upon this question, is apparent from the nature of the case.
*214 We are not satisfied, upon tifie present state of this record, to let this decree stand.
There is in existence, we may safely assume, more satisfactory evidence upon this question, which we regard as important, if not vital to the case; and this evidence, if produced, will enable the Court to come to a more satisfactory conclusion.
And the question now arises, as to the power of this Court to remand the cause for additional testimony. The parties and their counsel, have made up the record, and it may be said they have the right to demand decision upon the record as they choose to present it. Without entering into the discussion of this question, it will be sufficient to say, that the practice, though it might have been originally doubtful, is sanctioned by authority: See the case of John D. Cowan vs. Dodd & Mitchell, 3 Coldwell, 279. And we are the more willing to adopt this course, inasmuch as it will avoid the danger of determining the case upon an assumption of facts, which, though justified by the record, might, in reality, be erroneous; and the danger of doing practical injustice to the parties by a final decision at present, appears to be very great.
Without expressing any more decided opinion upon the questions in the cause, the decree will be reversed and the cause remanded to the Chancery Court at Ma-ryville for additional testimony upon the question indicated.
The costs of this Court will be divided.